MARVYN SCUDDER, Appellant, v. J. MITCHELL HOYT and Another, Respondents.

First Department, June 4, 1926.

Brokers — loan brokers — action to recover commission for procuring loan for corporation — payment of commission was guaranteed by defendants — General Business Law, § 380, limiting commission to one-half of one per cent is not usury law — neither corporation nor defendants prohibited from pleading statute — said statute relates to business coupled with public interest and is within police power of State — statute not void as interfering with right to contract.

In an action to recover from the defendants as guarantors of the payment of a commission for procuring a loan for a corporation, the defendants are entitled to plead section 380 of the General Business Law which limits the amount of commission to one-half of one per cent, for said law is not a usury law which the corporation and the defendant guarantors could not plead, and there is nothing in the General Business Law to prevent the defendants from setting up section 380 as a defense to the action.

Said section relates to a business that is coupled with a public interest and, therefore, the regulation thereof comes within the police power of the State. The statute is constitutional because it protects the public against extortion and unconscionable charges by people in a position to loan money to those who feel that they must obtain it without regard to terms. It is a necessary statute in order that the money lender and the broker cannot, by co-operating, avoid the effect of a regulation directed solely against usury.

The contention that the statute unduly interferes with the right to make contracts is without merit, for there is no freedom of contract where necessitous borrowers must accept the terms offered by the lender.

MERRELL, J., dissents.

APPEAL by the plaintiff, Marvyn Scudder, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 16th day of May, 1924, upon the dismissal of the complaint at the close of plaintiff's case.

*Edward S. Seidman* of counsel [*Henry Wollman* and *Robert G. Starr* with him on the brief; *Wollman & Wollman,* attorneys], for the appellant.

*Samuel H. Kaufman* of counsel [*Leo Oppenheimer,* attorney], for the respondent.

MARTIN, J. In July, 1917, the defendants J. Mitchell Hoyt and Charles B. Little were in virtual control of the Smith Motor Truck Corporation of Chicago, manufacturer of truck attachments to be used on Ford or Dodge automobiles, they being the holders of large blocks of its stock. The plaintiff Scudder owned stock for which he paid $25,000. All three were directors, Scudder, however, having, at that time, recently become a member of the board of directors.

About July 15, 1917, Hoyt told Scudder that the corporation needed money to pay pressing debts and for working capital, and that he believed Scudder could be of great assistance in raising the necessary funds. It was suggested that treasury stock be sold in preference to raising a loan; and Hoyt requested Scudder to see whether he could accomplish such a sale. Alternatively Scudder was requested to procure a loan for the company if that were possible. Scudder said to Hoyt: " I would be pleased to do this, but I did want to have my protection as to payment for these services in writing." Hoyt told him that he and Little would see that Scudder should be paid $25,000 if the full amount of $750,000 were obtained for the corporation, either through the sale of treasury stock or a loan, or both. Accordingly, the following agreement was signed:

" *July 24th,* 1917.

" MEMORANDUM OF AGREEMENT.

" In connection with the furnishing of monies up to $750,000 either as a loan to the Smith Motor Truck Corporation or the purchasing of its securities, Marvyn Scudder is to receive $25,000 as commission, or an amount proportionately less as the amount loaned or paid bears to $750,000, where he has introduced the parties advancing or paying these monies. In other words, he is to get $3.33\frac{1}{3}\%$ as commission for the monies thus obtained up to $750,000. In order that the matter may be perfectly clear, the undersigned agree to see that he is paid his commission. No commission is to be paid unless such a deal is consummated.

" J. M. HOYT,

"Accepted:                                   C. B LITTLE.

" MARVYN SCUDDER."

After endeavoring to place the stock or the loan with various people, and failing to sell the stock, Scudder succeeded in obtaining a loan of $750,000 for the corporation from J. & W. Seligman & Co., bankers of New York city.

It is conceded that this loan to the corporation of $750,000 was obtained by Scudder.

When Seligman & Co. ascertained that Scudder was to receive a commission out of the proceeds of the loan, they protested. Thereupon Hoyt and Little proceeded to persuade Scudder to take the corporation's note, payable one day later than the day on which the loan of the bankers was to mature. Scudder at first refused, but, finally yielding to the pleading of Hoyt and Little not to make a " row " and " spoil the whole deal," he agreed to take the corporation's note, it being agreed nevertheless, that Hoyt and Little would remain liable to him pursuant to the original agreement.

The corporation's note which Scudder held, not having been paid when due, was protested for non-payment, of which Hoyt and Little were duly notified. Scudder sued on the note.

Notwithstanding that the company obtained this loan of $750,000, its affairs did not improve, and in October, 1917, a committee of its creditors was formed. The chairman of the committee asked Scudder for an extension of time as to the corporation's note, but he refused unless Hoyt and Little would consent thereto. On their requesting him to do so, he granted the extension.

The corporation finally went into bankruptcy, its net assets were distributed among its creditors and Scudder received about $5,000 on said note.

Hoyt and Little never having paid Scudder anything, he brought this action against them, on their written agreement " to see that he is paid his commission," and to recover $25,000, less what he received from the estate in bankruptcy of the corporation.

There was a jury trial. At the end of the plaintiff's case the court dismissed the complaint solely on the ground that section 380 of the General Business Law, which provides that no one shall receive more than one-half of one per cent brokerage for procuring loans other than real estate loans, was applicable, and judgment was entered accordingly.

The plaintiff's argument is that section 380 of the General Business Law is a usury statute; that the principal, being a corporation, neither it nor its guarantors, the defendants, could, under section 374 of the General Business Law, set up the defense of usury, and that, if section 380 is not a part of the legislation in this State against usury, then it is unconstitutional as violating the rights and liberties

of the citizens and, in particular, the right of contract.    (See U. S. Const. 14th Amendt. § 1; State Const. art. 1, § 6.)

The prohibition against taking a brokerage of more than a certain amount made its first appearance in the laws of the Colony of New York, passed May 27, 1717 (1 Colonial Laws of New York [Comp. Stat. Rev. Comm.], 909, chap. 328.)    There we find not only a provision against usury but also one against brokerage at more than a specified rate.    It was provided in part: " That all and every Scrivener and Scriveners, Broker and Brokers, Solliciter and Solliciters, Practicioner of the Law, and Practicioners, Driver and Drivers of Bargains for Contracts, who shall, after the time aforesaid, take or Receive, directly or Indirectly, any Sum or Sums of Money, or other Reward, or thing for Broakage, Soliciting, Driving or Procuring the Loan or bargain, or the forbearing of any Sum or Sums of Money, over and above the Ratè or Value of Ten Shillings for the Loan, or for forbearing of one hundred pounds for one Year, And so proportionably for a Greater or Lesser sum, or above Eighteen Pence for the making or Renewing a Bond or Bill for the Loan, or for the forbearing thereof, or for any Bond, Counterbond or Bill concerning the Same, Shall forfeit for every Such Offence Twenty pounds, and have Imprisonment for half a Year."

The statute by its terms was to continue in force for five years. Fifteen years after its expiration, another similar enactment went into effect (2 Colonial Laws of New York [Comp. Stat. Rev. Comm.], 980, chap. 660), enacted December 16, 1737, and becoming operative as of May 1, 1738.    It, too, provided against usury and against taking brokerage above a stated rate.

The statute of 1737 remained in effect until New York became a State, and such statute became the law of the State.    (See Const. 1777, art. 35.)    On February 8, 1787, an act entitled "An act for preventing usury " was passed by the State Legislature.    (Laws of 1787, chap. 13.)    This act was republished with the Revised Acts of 1801 and also with the Revised Laws of 1813.    (See 1 K. & R. 57; 1 R. L. 64, § 1; Id. 65, § 3.)    It was similar to the prior legislation and contained provisions against usurious interest and against brokerage on loans beyond a fixed amount.    It remained the law of this State until the passage of the acts of 1827–1828 (printed in the first Revised Statutes of the State in 1829), which took effect on January 1, 1830 (Laws of 1828, 2d Meeting, chap. 20; 2 R. S. 777, 778, Appendix), and which referred to interest and brokerage on loans under different titles.    Title 3 of chapter 4 of part 2 of the Revised Statutes (1 R. S. 771, § 1 *et seq.*) treated " Of the interest of money."    It established the maximum rate of interest at seven dollars per year for every one hundred dollars loaned; like its prede-

cessors it contained provisions for the recovery of moneys paid in excess of the legal rates.

Brokerage, stock-jobbing and pawnbrokers were dealt with under title 19 of chapter 20 of part 1 of the Revised Statutes (1 R. S. 709). The regulations concerning brokers were enacted in section 1 *et seq.* of article 1 of said title 19.

This legislation, with certain amendments made by chapter 430 of the Laws of 1837 and chapter 172 of the Laws of 1850 and other statutes which are not here material (*Curtiss* v. *Teller,* 157 App. Div. 804, 807 *et seq.; Middleman* v. *Elias Press, Inc.,* 124 Misc. 717, 719, 720), continued effective until the passage of chapter 467 of the Laws of 1895, which amended section 1 of article 1 of title 19 of chapter 20 of part 1 of the Revised Statutes, which title was entitled " Of brokerage, stock-jobbing, and pawn-brokers." The purpose, object and effect of the amendment was to permit those securing real estate loans for others to receive brokerage without limitation.

On February 17, 1909, in the General Business Law, the Legislature, upon the report of the revisers, placed both excessive interest and brokerage under chapter 25, article 25, of the Laws of 1909 (Consol. Laws, chap. 20), entitled: " Interest and Usury " (§§ 370–382), so that the statute, if not already a part thereof, then became a part of the enactments on " interest and usury." It is now section 380 of the General Business Law and it provides: " No person shall, directly or indirectly, take or receive more than fifty cents for a brokerage, soliciting, driving or procuring the loan or forbearance of one hundred dollars, and in that proportion for a greater or less sum, except loans on real estate security; nor more than thirty-eight cents for making or renewing any bond, bill, note or other security given for such loan or forbearance, or for any counter bond, bill, note or other security concerning the same."

The section of the law which prohibits brokers charging more than a certain amount is not, strictly speaking, a usury statute. It may be in the nature of such, but not more so than the statute regulating pawnbrokers and others in their charges for loans on goods.

Defining usury, the Court of Appeals said in *Schermerhorn* v. *Talman* (14 N. Y. 93): " To constitute usury there must be a loan of money or its equivalent." (See *Weaver Hardware Co.* v. *Solomovitz,* 235 N. Y. 321.) A usurer has been defined as " a money lender who exacts excessive or inordinate interest from the needy or extravagant." There is no question here as to the constitutionality of usury laws, for the defendants in their brief concede the constitutionality of such laws. If it were not for an express

statutory enactment, the defense of usury might be interposed by a corporation. (*Salvin* v. *Myles Realty Co.*, 227 N. Y. 51.)

There is no statute prohibiting a corporation from pleading the defense permitted by section 380 of the General Business Law.

Sections 374 and 380 of the General Business Law are not directed against the same supposed evil. They are distinct and separate enactments. The history of the law shows that from ancient times excessive charges for interest or brokerage were treated as being equally harmful and pernicious.

There is nothing in any statute to prevent the defendants from pleading section 380 as a defense set up here. The question arises whether section 380 is constitutional. While antiquity is not logically final as to constitutionality, nevertheless, that a statute has been long in effect is very important in this connection.

On that subject the Court of Appeals said in *Biddles, Inc.*, v. *Enright* (239 N. Y. 354): " Courts should be very slow in declaring legislation which has been frequently re-enacted during the course of a century unconstitutional, where conditions may exist which make such a statute reasonably necessary for the public welfare."

In 39 Cyc. 910, the following is found: " That the State Legislatures have the constitutional power to enact laws regulating the rate of interest to be taken on loans of money, and to prescribe reasonable penalties for their violation, cannot be questioned. The provision of the Constitution of the United States* prohibiting the States from impairing the obligation of contracts applies only to contracts lawfully made, not such as are illegal and contrary to public policy, such as usury acts intended to protect the necessitous from the oppression of unscrupulous persons."

The Legislature has from time to time regulated the business of pawnbrokers and of other classes of brokers, placing limitations on their charges, when it has been decided that such activities are coupled with a public interest. The statute has placed in the same category all brokers whose services relate to money lending, except that the statutes have specially regulated pawnbrokers and small loan brokers and the interest which may be legally chargeable by them. (See General Business Law, art. 5, as amd.; Id. § 46; Banking Law of 1914, art. 9, as amd.; Id. § 345, as amd. by Laws of 1915, chap. 588, and Laws of 1920, chap. 703.)

The question is whether the business is so coupled with a public interest that its regulation comes within the police power of the State.

The statute is similar to a usury statute in that it is intended to

---

* See U. S. Const. art. 1, § 10, subd. 1.— [Rep.

prevent extortion and unconscionable charges by people in a position to loan money to those needing it or who feel that they must obtain it, regardless of terms. So long as the views sanctioned by our laws obtain, it must be held that this statute relates to activities coupled with a public interest and that it is constitutional because it protects the public from the usurer, the loan shark and money lender.

In *Commonwealth* v. *Young* (57 Penn. Super. Ct. 521, 523) the court passing on a similar statute referred to the fact that this subject had been under government control for centuries, and said: " The appellant relies for his defense on the unconstitutionality of the Act of June 5, 1913, P. L. 429,* under which he was convicted of lending money at a greater than the lawful rate of interest without having received a license to lend money at interest and charge for the loan thereof a brokerage and examination fee in addition to interest at six per cent per annum. It is not denied that the regulation of interest on loans is a proper subject of legislative action. It has been a matter of governmental control for centuries, and interest in excess of that allowed by law has been regarded as usurious. The exacting of usury was an offense at common law and is generally prohibited as unconscionable in civilized governments. That it is properly subject to the police power of the State cannot be doubted: *Munn* v. *Illinois;* 94 U. S. 113; *State* v. *Griffith,* 83 Conn. 1; *Iowa S. Association* v. *Heidt,* 107 Ia. 297. This power as was said by Chief Justice TANEY in *License Cases,* 5· Howard, 583, and reaffirmed in *Munn* v. *Illinois, supra,* is nothing more nor less than the powers of government inherent in every sovereignty — that is to say, the power to govern men and things. That it extends to the protection of the life, health and property of the citizens and to the preservation of good order and the general welfare is an elementary declaration of the law. It is a power as to which the Constitution of the State forbids that it shall be abridged. The public welfare is to be secured and protected by its exercise in such manner as the legislative discretion may provide."

In *People* v. *Beakes Dairy Co.* (222 N. Y. 416) the court said that it would be very reluctant to set aside statutes clearly intended to strike at a well-known evil. It was there said: " To hold a statute unconstitutional is a grave thing to do. To refuse, by so doing, to recognize a demonstrated evil and to characterize the unusual in legislation as impossible is unwise. Constitutional law is ' to a certain extent, a progressive science ' (*Holden* v. *Hardy,* 169 U. S. 366, 385), and the courts have become more cautious

---

* See Penn. Laws of 1913, p. 429, No. 285.— [REP.

· 2

' about pressing the broad words of the Fourteenth Amendment to a drily logical extreme.' (*Noble State Bank* v. *Haskell*, 219 U. S. 104, 110.) So many decisions of the courts of this State and of the United States have dealt with the question of legislative power that only a few of the most recent will be considered. We may begin with the proposition that the State may not prohibit the lawful, common and ordinary business of purchasing milk or cream (*People ex rel. Tyroler* v. *Warden, etc.*, 157 N. Y. 116; *Fisher Co.* v. *Woods*, 187 N. Y. 9C; *Adams* v. *Tanner*, 244 U. S. 590), but it may regulate a business, however honest in itself, if it may become a medium of fraud. It is not enough to say that the business may be honestly conducted. The State may, to some extent, compel honesty by imposing a license fee if widespread frauds upon and losses by its people are thereby prevented. Any trade, calling or occupation may be reasonably regulated if ' the general nature of the business is such that unless regulated many persons may be exposed to misfortunes against which the Legislature can properly protect them.' (*Allen* v. *Riley*, 203 U. S. 347; *Brazee* v. *Michigan*, 241 U. S. 340, 343.) Passing from the general to the particular, the constitutionality of the ' Blue Sky Laws ' of Ohio and other States which require dealers in corporate stocks and other securities to be licensed has been upheld. (*Hall* v. *Geiger-Jones Co.*, 242 U. S. 539; *Caldwell* v. *Sioux Falls Stock Yards Co.*, 242 U. S. 559; *Merrick* v. *Halsey & Co.*, 242 U. S. 568.) The evils of ' get-rich-quick ' schemes called for·protection against the frauds of unscrupulous dealers. Licenses may be required for employment agencies. (*Brazee* v. *Michigan, supra; People ex rel. Armstrong* v. *Warden, etc.*, 183 N. Y. 223.) The business of banking by individuals and partnerships has been held subject to license (*Musco* v. *United Surety Co.*, 196 N. Y. 459, 465; *Engel* v. *O'Malley*, 219 U. S. 128) ' because· fraud could be practiced in it.' The business of selling patent rights, being peculiarly one in which fraud may be practiced, may be regulated. (*Allen* v. *Riley, supra.*) Even ' ice cream ' may be standardized by State Legislatures in order that consumers may not be misled (*Hutchinson Ice Cream Co.* v. *Iowa*, 242 U. S. 153), and a standard size of bread loaves may be fixed. (*Schmidinger* v. *City of Chicago*, 226 U. S. 578.) "

In *Welch* v. *Swasey* (193 Mass. 364, 372, 373) the court said that the Legislature had a right to pass such laws for the welfare of the citizens: " In the exercise of the police power the Legislature may regulate and limit personal rights and rights of property in the interest of the public health, public morals and public safety. *Commonwealth* v. *Pear*, 183 Mass. 242. *Commonwealth* v. *Strauss*, 191 Mass. 545. *California Reduction Co.* v. *Sanitary Reduction*

*Works,* 199 U. S. 306, 318. With considerable strictness of definition, the general welfare may be made a ground, with others, for nterference with rights of property, in the exercise of the police power. *Commonwealth* v. *Strauss, ubi supra.*"

In *Mutual Loan Co.* v. *Martell* (200 Mass. 482, 484) the court said: "These sections interfere with the rights of the assignor and assignee to contract with each other, which right of contract, in general, is secured to all our citizens under the Fourteenth Amendment to the Constitution of the United States, as well as under the Constitution of Massachusetts. Such an interference by law with one's right to manage his property and to make contracts in relation to it and to pursue any proper vocation is in violation of such constitutional rights, unless it can be justified upon an independent ground. The defendant contends that there is such justification, in the present case, in the enactment of this statute by the Legislature in the exercise of the police power."

In *Commonwealth* v. *Danziger* (176 Mass. 290) the court, holding a statute constitutional which limited loans on deposits or pledges of personal property, said: "The statute was enacted under and by virtue of what is termed the police power, that is, the power to make and establish all manner of wholesome and reasonable laws and statutes for the good and welfare of the Commonwealth. It is not necessary that statutes passed in the exercise of that power should apply equally and uniformly to all citizens of the Commonwealth in order to be constitutional. It is sufficient if they apply equally and uniformly to all who are similarly circumstanced and are not otherwise objectionable. Such statutes have been upheld as constitutional in numerous instances. *Goddard, Petitioner,* 16 Pick. 504. *Watertown* v. *Mayo,* 109 Mass. 315, 318, and cases cited. *Commonwealth* v. *Roberts,* 155 Mass. 281. *Commonwealth* v. *Parks,* 155 Mass. 531. *Opinion of the Justices,* 163 Mass. 589. *Cole* v. *Tucker,* 164 Mass. 486. *Newton* v. *Joyce,* 166 Mass. 83. *Commonwealth* v. *Morris,* 176 Mass. 19. We see nothing in the present case that renders the statute, under which this complaint was instituted, unconstitutional in any other respect. There can be no doubt about the right of the Legislature to regulate the business of pawnbrokers or of persons engaged in the kind of business, described in the statute under which this complaint was brought; neither can there be any doubt as to its right to limit such regulations to persons carrying on such business in cities and towns of ten thousand inhabitants or more."

In *Commonwealth* v. *Strauss* (191 Mass. 545, 550, 551) the court said: "There is no doubt that the statute before us puts a limitation upon the general right to make contracts. The contention of the

Commonwealth is that this limitation is valid as an exercise of the police power. The nature of the police power and its extent, as applied to conceivable cases, cannot easily be stated with exactness. It includes the right to legislate in the interest of the public health, the public safety and the public morals. If the power is to be held within the limits of the field thus defined, the words should be interpreted broadly and liberally. If we are to include in the definition, as many judges have done, the right to legislate for the public welfare, this term should be defined with some strictness, so as not to include everything that might be enacted on grounds of mere expediency. In the very late case of *Lochner* v. *New York,* 198 U. S. 45, 53, the majority of the Court said, ' Those powers, broadly stated and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals and general welfare of the public.' In the opinion in *Louisville & Nashville Railroad* v. *Kentucky,* 161 U. S. 677, 701, we find this language: ' The general rule holds good that whatever is contrary to public policy or inimical to the public interests is subject to the police power of the State, and within legislative control, and in the exertion of such power the Legislature is vested with a large discretion, which, if exercised *bona fide* for the protection of the public, is beyond the reach of judicial inquiry.' * * *

"A few years ago there was no occasion for such an enactment. But lately we see great aggregations of capital formed to obtain command, if possible, of the field of production or distribution into which they enter. Even now, in the transaction of business among equals where there is free competition, the statute is unnecessary, for there is no inducement to do that which it forbids. Its practical effect is to prevent great corporations from making a certain kind of contracts intended to drive ordinary competitors out of business.

" The question is whether, at the time of the passage of this statute, there were conditions actually existing or reasonably anticipated which called for such legislative intervention in the interest of the general public. We are of opinion that there were, and that, in a broad and liberal sense of the words, this statute was enacted in the interest of the public health and the public safety, if not of the public morals. Certainly the purpose of the Legislature was to promote the general welfare of the public. We cannot say that this legislative action was not a legitimate exercise of the police power. Its invasion of the general right to make contracts is so slight, and in a field so remote from ordinary mercantile transactions, that there is little ground of objection on that score. The abuse at which the statute is aimed, while not practiced by many persons, is real and widely pervasive."

In *Dewey* v. *Richardson* (206 Mass. 430) the court said: " The loans referred to are of $200 or less, upon which a rate of interest greater than twelve per cent per annum is charged, and for which no security other than a note or contract, with or without an indorser, is taken. The Legislature evidently had in mind the danger that such a business, if left without regulation, would be conducted oppressively, and the statute was enacted with a view to furnish a degree of protection to borrowers. Similar provisions have been enacted in regard to conducting the business of a pawnbroker, and in regard to conducting the business of making loans secured by mortgage or pledge of household furniture or other personal property exempt from attachment, for less than $200, or at a rate of interest greater than twelve per cent. R. L. c. 102, §§ 33, 39, 57, 66. If there is danger of oppression in carrying on a business of this kind, the Legislature, in the exercise of the police power, may regulate it by statute, in the interest of the people who may be liable to such oppression. The regulation of the exercise of private rights has been considered by this court in many cases. *Mutual Loan Co.* v. *Martell*, 200 Mass. 482. *Commonwealth* v. *Strauss*, 191 Mass. 545. *Welch* v. *Swasey*, 193 Mass. 364. *Commonwealth* v. *Pear*, 183 Mass. 242. We cannot say that the Legislature might not properly determine that carrying on such a business for gain calls for regulation, and might not accordingly provide that no one should engage in the business unless duly licensed. It was decided that the similar statute relative to engaging in the business of a pawnbroker was constitutional. *Commonwealth* v. *Danziger*, 176 Mass. 290.

" The plaintiff attacks particularly the requirement of § 2* that the licensing officer or board shall from time to time establish regulations respecting the business, and the rate of interest to be charged, having due regard to the amount of the loan and the time for which it is made. Under this section, the rate of interest prescribed may be different in one city or town from that in another. The right of the Legislature to delegate to a local board the making of regulations under statutes has long been recognized in this Commonwealth, as properly founded on the principle of local self-government, which has been a part of the law of New England from the earliest times. *Brodbine* v. *Revere*, 182 Mass. 598. *Welch* v. *Swasey*, 193 Mass. 364. It is quite possible that in two different cities of the State, remote from each other, conditions might be so different as to justify the establishment of different rates of interest for short loans of small amounts in different places. The statute

---

*See Mass. Acts of 1908, p. 713, chap. 605, § 2.— [REP.

as to pawnbrokers contains substantially the same provision, and it was held constitutional. R. L. c. 102, § 35. *Commonwealth* v. *Danziger*, 176 Mass. 290."

While the broker and the lender do not perform the same function, Legislatures have deemed it expedient in the public interest to regulate both, in order that, by co-operating, they may not avoid the effect of a regulation directed solely against extortion in relation to loans.

This statute we consider to be a proper exercise of the police power. It is said that it unduly interferes with the right to make contracts. This depends on the point of view and the public interest, which are peculiarly for the field of legislation. Looking at the matter with laws in mind of the character which obtain and have obtained here for centuries, it might be said that there is no freedom of contract where necessitous borrowers must accept the terms offered by the extortioner and fixed by the usurer.

It seems to us, therefore, that this statute is constitutional as a proper exercise of the police power.

The judgment should be affirmed, with costs.

CLARKE, P. J., and FINCH, J., concur; MERRELL, J., dissents.

Judgment affirmed, with costs.