**Edwin F. ARMSTRONG, Jr. and Meredith Armstrong Aldrich, Plaintiffs,**

v.

**RANGAIRE CORPORATION, Defendant.**

**No. 79 Civ. 2549 (WCC)**

United States District Court,
S. D. New York.

June 18, 1980.

George T. Vogel, Yonkers, N. Y., for plaintiffs.

Jacobs, Persinger & Parker, New York City, for defendant; Stuart Perlmutter, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiffs Edwin F. Armstrong, Jr. ("Armstrong, Jr.") and Meredith Armstrong Aldrich have brought this action as successors in interest to Edwin F. Armstrong & Co., Inc. ("Armstrong Corporation" or "Armstrong") to recover the sum of $70,000 allegedly owed under a broker's contract between Armstrong Corporation and defendant Rangaire Corporation ("Rangaire") following Rangaire's securing of a loan of $7,000,000 in 1979 from Teachers Insurance and Annuity Association of America ("Teachers"). Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. The case is presently before the Court on defendant's motion and plaintiffs' cross-mo-

tion for summary judgment pursuant to Rule 56, F.R.Civ.P.

*Background*

The following facts are not in dispute. In early 1967, Rangaire, a diversified Texas corporation with three principal lines of business—manufacture of range hoods and other appliances and lighting fixtures, limestone extraction and processing, and general construction contracting—responded to an earlier solicitation from Armstrong by indicating interest in using Armstrong's services to secure financing in the amount of $4,000,000. Armstrong, a New York corporation specializing in corporate financings and private placements, contacted Teachers, also a New York corporation and a large institutional investor, to discuss the proposed financing.

In late March and early April, Rangaire and Armstrong worked out the terms of their business relationship. They reached an initial understanding at a meeting in a restaurant in New York. That understanding was confirmed in a letter of March 28, 1967 from Armstrong, Jr., corporate secretary of Armstrong Corporation and one of the corporation's three shareholders[1], to J. M. Hill, Vice-President and Assistant Treasurer of Rangaire ("Hill"), forwarding draft authorization forms to Rangaire; in a letter of March 31, 1967, from Armstrong, Jr. to Hill, countersigned "Accepted and Approved" by Rangaire, providing that Armstrong Corporation's

"fee is to be 1% of the loan amount—deemed to be earned upon [Rangaire's] approval and signed acceptance of a written commitment. The same 1% fee shall be applicable on any additional amounts borrowed by your Company from the lender we provide, directly or through us, during the loan term," Complaint, Exhibit A;

and, finally, in Rangaire's written authorization of April 3. The authorization

granted Armstrong Corporation an exclusive contract to obtain a long-term loan of $4,000,000 for Rangaire, with the understanding that loan terms and conditions would include a limitation on Rangaire's cash dividends and stock redemptions, Rangaire's commitment to maintain working capital at a stated level, Rangaire's agreement to limit its long-term rentals, and a "Negative Pledge" that Rangaire would

"agree not to mortgage or enter into sale and leaseback of any of our fixed assets." Armstrong Affidavit, Exhibit 3

On April 24, 1967, Teachers notified Rangaire, through Armstrong, that Teachers' Finance Committee had authorized the purchase of $4,000,000 of Rangaire promissory notes. The notification letter also recited, as a term of Teachers' authorization, that Rangaire "will agree not to mortgage or enter into sale or leaseback of any of its fixed assets." Armstrong Affidavit, Exhibit 5.

In August 1967, the loan closed. Rangaire and Teachers signed a Note Purchase Agreement providing, among other things, that Rangaire would use the proceeds of the loan to retire a similar amount of existing indebtedness, *id.* at Section 2.4, and that Rangaire warranted that it had good title to, among other things, all real property reflected in its balance sheet, *id.* at Section 2.7. The notes, due in 1982, contain further commitments by Rangaire to, among other things, maintain, insure and pay taxes on its real property, and maintain that property free of encumbrances. Section 4.2 of the notes, the negative covenant on encumbrances, specifically provides that:

"Neither the Company [Rangaire] nor any subsidiary will

(a) Create or permit to continue in existence any mortgage, pledge, encumbrance, lien, security interest or charge (herein collectively called '*liens*') of any kind upon any of its property or assets, whether owned at the date hereof or hereafter acquired; or

---

1. The other two shareholders were Armstrong, Jr.'s father, Edwin F. Armstrong, who served as president of the corporation, and Armstrong, Jr.'s, mother. The corporation was liquidated following Edwin F. Armstrong's death, and

Armstrong, Jr. and Aldrich (Armstrong's sister) are the corporation's successors in interest. Armstrong, Jr. has continued in the financial intermediary business under the name of Edwin F. Armstrong & Co.

(b) Transfer any of such property or assets for the purpose of subjecting the same to the payment of obligations (including without limitation obligations to pay installments upon purchase contracts or to pay rent, whether or not deemed Indebtedness) in priority to payment of its general creditors . . ."

with exceptions for incidental liens not incurred in connection with borrowing money or obtaining credit. Section 6.1(3) provides that the notes shall become payable immediately upon demand if any default occurs "in the due observance or performance of any covenant contained in § 4.1 to § 4.12, inclusive." Armstrong Affidavit, Exhibit 6. Both the Note Purchase Agreement and the notes contain a choice of law clause providing that the agreement shall be governed by New York law.

In accordance with its agreement, Rangaire paid Armstrong Corporation a fee in connection with this loan, at a rate adjusted to allow Rangaire to pay the fee over a ten-year period rather than immediately. Affidavit of J. M. Hill, Exhibit 1.

In 1972, Rangaire secured another loan from Teachers in the sum of $2,000,000, and paid Armstrong its 1% fee. The terms of the 1972 Note Purchase Agreement and notes were substantially identical to those contained in the 1967 Agreement and notes with respect to use of proceeds, Rangaire's representations of good title to real property, Rangaire's covenant in its notes not to mortgage or otherwise encumber its property, the notes' default and acceleration clauses, and choice of law governing the arrangement. Armstrong Affidavit, Exhibits 8 and 9.

In February 1979, Rangaire secured a third loan from Teachers in the amount of $7,000,000. The terms of this loan provide that proceeds are to be used both to refund current liabilities and for capital expenditures; other terms with respect to title to real property, encumbrance of property, default and acceleration of Rangaire's obligations under its new notes are, again, substantially identical to the terms of the 1967 loan arrangement. Affidavit of J. M. Hill, Exhibit 2.

*Contentions*

Plaintiffs contend that under the terms of their 1967 agreement with defendant, they are entitled to a fee of $70,000, or 1% of the loan amount, in connection with the 1979 loan from Teachers to Rangaire, since that loan was made to Rangaire by the lender secured by Armstrong and was transacted during the term of the original loan from Teachers to Rangaire.

Defendant does not deny that it is obligated to pay such a fee by the terms of its contract with Armstrong, but asserts as affirmative defenses that (1) plaintiffs' recovery under the contract in connection with the 1979 loan is limited to ½ of 1% of the amount of the loan, or $35,000, by New York General Obligations Law § 5–531; and (2) that with respect to the claim for $35,000, defendant may offset that claim by that portion of the fees defendant previously paid to Armstrong in connection with the 1967 and 1972 loans in excess of the .5% limit on brokerage fees established by Section 5–531. Defendant computes this offset to be $46,000, thus precluding any recovery by plaintiffs.

Plaintiffs respond, first, that Section 5–531 is not applicable to this transaction, since the Court should apply Texas law, rather than New York law, to determine the respective obligations of the parties. Secondly, plaintiffs argue that Section 5–531 should not be construed to apply to private placements of this type and size. In support of this assertion, plaintiffs point to a survey of the use of intermediaries as private placement brokers listing typical fees (1% fee typical for $4,000,000 loan), and to a Merrill Lynch, Pierce, Fenner and Smith fee schedule stating that for smaller private placements (between two and five million dollars), Merrill Lynch typically charges a fee of between one and three per cent of the financed amount. Armstrong Affidavit, Exhibit 16. Plaintiffs further state that, to Armstrong, Jr.'s knowledge, financial intermediaries in Armstrong's position generally do not consider Section 5–531 applicable to their activities. Arm-

strong Affidavit, ¶ 20. Thirdly, plaintiffs state that if Section 5–531 is applicable, this transaction falls under the exception within that section for "loans on real estate security," since that exception has been construed broadly and since the financing here was based, in a broad sense, on Teachers' evaluation of Rangaire's real estate holdings and on Rangaire's negative covenant assuring Teachers that Rangaire would not use its real property as security for any other loan or credit arrangement. Finally, plaintiffs maintain that the one-year limitation period in Section 5–531 for actions to recover overpayments under the statute bars defendant's claim for equitable recoupment as to the first two fee payments, and that defendant cannot, further, claim a right to recoupment as an equitable matter when defendant received full value from Armstrong on the first two loan transactions and is attempting to avoid its agreement with Armstrong as to the last loan.

Defendant replies that New York law is applicable; that "loans on real estate security" means loans secured in the technical sense, *i. e.*, by a mortgage on real property, assignment of a lease, or other arrangement giving the lender the status of a secured creditor with respect to property of the debtor; that, with respect to the statute of limitations, the one-year limitation on offensive use of the statute does not by its terms apply to the type of defensive offset or recoupment asserted here; that, in any event, plaintiffs' lawsuit started the running of the statute anew, since the loans are all part of one related transaction, and that a plea of equitable recoupment may be asserted defensively even if statutorily time-barred where, as here, barring the plea would frustrate the purpose and spirit of the legislation.

*Discussion*

1. Conflicts

New York General Obligations Law § 5–531 provides, in relevant part, that:

"1. No person shall, directly or indirectly, take or receive more than fifty cents for a brokerage, soliciting, driving or procuring the loan or forbearance of one hundred dollars, and in that proportion for a greater or less sum, except loans on real estate security; nor more than thirty-eight cents for making or renewing any bond, bill, note or other security given for such loan or forbearance, or for any counter bond, bill, note or other security concerning the same.

"2. a. Every person who shall pay, deliver or deposit any money, property or thing in action, over and above the rate aforesaid, and his personal representatives may, within one year after such payment, delivery or deposit, sue for and recover the same of the person so taking or receiving such money, property or thing in action, or of his personal representatives."

Texas has no similar statute.

The first issue before the Court is which state's law to apply. Under *Klaxon v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1940), this Court in a diversity action must look to New York's choice of law rules to make this determination. New York law generally gives controlling effect "to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). When enforcement of a New York statute is involved, New York law requires the Court to examine the purpose and policy underlying that statute to determine whether New York or some other jurisdiction has the paramount interest in application of its laws. *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969).

In *Daystrom, supra*, the Court of Appeals applied Section 5–701 of the General Obligations Law, New York's statute of frauds applicable to brokers and finders, rather than New Jersey law, which lacked a similar provision, in an action to recover a finder's fee from a foreign corporation. The court reasoned that the purpose of the New York statute—to prevent erroneous verdicts

or fraudulent brokerage or finder's fee claims—was based on a policy of protecting the principals in the sale of a business interest; that the policy included protection of foreign principals who came to New York to make brokerage and other financial arrangements because of New York's position as an "international clearing house and market place," *id.* at 300 N.Y.S.2d 827, 248 N.E.2d at 586; and that the dispute had sufficient contacts with New York to give New York a substantial interest in applying its policy, since plaintiff was a New York corporation whose business was based in New York state, the arrangement stemmed from a solicitation from plaintiff's office, discussions were held and an agreement was reached on a finder's fee at a New York restaurant, and "The remaining contacts leading up to the execution of the written finder's fee agreement involve letters and telephone calls emanating from plaintiff's New York office" and defendant's office in New Jersey. 300 N.Y.S.2d at 827, 248 N.E.2d at 586.

█ The situation here is substantially similar to that in *Daystrom.* New York enacted Section 5–531 for the purpose of preventing excessive charges for brokerage, as part of a general statutory scheme to prevent "extortion and unconscionable charges by people in a position to loan money to those needing it, or who feel they must obtain it, regardless of terms." *Scudder v. Hoyt,* 218 A.D. 11, 216 N.Y.S. 305, 310 (1st Dept. 1926), *aff'd,* 245 N.Y. 522, 157 N.E. 842 (1927). New York clearly has a strong interest in applying this policy, see *Scudder, supra,* and New York's position as a financial center again suggests, as in *Daystrom,* that this interest extends to protection of foreign borrowers allegedly injured by the evil which the statute was designed to prevent. See also *O'Keeffe v. Bry,* 456 F.Supp. 822, 827–28 (S.D.N.Y. 1978). Moreover, just as in *Daystrom, supra,* the arrangement here was initiated by plaintiff from New York, discussed and agreed upon orally at a restaurant meeting in New York, and formalized in letters and documents exchanged between plaintiff in New York and defendant in its home state.

Finally, the application of New York law to this agreement appears well within the expectation of the parties, see *O'Keeffe, supra,* 456 F.Supp. at 828, in light of the fact that the loan on which this broker's contract claim is based was negotiated with a New York lender and that New York law is the law chosen by both borrower and lender to govern that arrangement.

Accordingly, the Court will apply New York law to resolve the disputes at issue here.

### 2. Applicability of Section 5–531

**(a) Applicability to Private Placements Generally**

The next issue before the Court is whether Section 5–531 should be construed to apply to the type of brokerage claim involved in this case. An examination of the statute, the New York case law interpreting the section, and the relationship of the section to New York's usury laws and to the securities laws generally convinces the Court that the New York legislature did not intend the statute to apply to private placement transactions between corporate borrowers and large institutional lender-investors such as Teachers.

**(i) The Law**

In *Scudder v. Hoyt, supra,* the First Department discussed the history of Section 5–531 in detail. As that court described it, a statutory prohibition against charging brokerage fees exceeding a specified rate was first enacted in New York in 1717 as part of a statute proscribing usury, as well as excessive charges by solicitors, scriveners, and persons extending credit. Similar statutes containing both provisions against usurious interest charges and against brokerage charges over a certain amount were reenacted in 1737 and 1787. In 1827, the usury and brokerage fee provisions were separated into different sections. In 1895, the brokerage fee section was amended to exempt loans on real estate transactions from the limitation on allowable charges. 216 N.Y.S. at 307–09.

In 1850, the usury statute was limited by enactment of a further provision designed to prohibit a corporation from interposing the defense of usury, as the social policies underlying the usury statute—protection of needy borrowers from overreaching or extortionate charges by lenders willing to exploit their desperation—did not apply to corporate business borrowers. See *Schneider v. Phelps*, 41 N.Y.2d 238, 391 N.Y.S.2d 658, 359 N.E.2d 1361 (1977); *Middleman v. Elias Press*, 124 Misc. 717, 209 N.Y.S. 123, 125 (City Ct. N.Y., 1925). That provision is now Section 5–521 of the General Obligations Law.[2] The current New York usury statute further exempts commercial and business borrowings from its scope by providing that the law's limitation on interest charges does not apply to loans of $250,000 or more, except for loans secured primarily by an interest in real property improved by a one- or two-family residence. New York General Obligations Law § 5–501, subdivision 6.

Courts applying Section 5–531 and its predecessors have generally been called to do so in cases involving brokerage charges for procurement of smaller-scale loans to individual borrowers. *Cook v. Phillips*, 56 N.Y. 310 (1874) (real estate brokerage and loan to individual; case decided before 1897 amendment exempting loans on real estate security from statute); *Levy v. Zetland*, 112 N.Y.S.2d 885 (1st Dept. 1952) (individual services rendered in non-real estate transaction); *H. D. Robbins & Co. v. Druckman*, 181 N.Y.S. 367 (1st Dept. 1920) (loan broker's claim against individual defendant on $5,000 loan); *Buchanan v. Tilden*, 18 A.D. 123, 45 N.Y.S. 417 (2d Dept. 1897) (loans procured in anticipation of inheritance from contested will of defendant's uncle, Samuel J. Tilden).

In those few cases in which the New York courts have considered the application of the statute to brokerage fee claims based on corporate borrowings, they have generally declined to apply the statute when the situation involved an otherwise unexceptionable raising of corporate capital, but applied the statute to situations involving fraudulent or questionable brokerage dealings in loans to closely held corporations. Thus, in *Middleman v. Elias Press, supra,* the plaintiff broker was hired by the defendant corporation to obtain a one-year loan payable in monthly installments and secured by a chattel mortgage on the corporation's plant. The broker sued on its contract and the corporation raised an affirmative defense based on Section 380 of the General Business Law, the immediate predecessor to Section 5–531. The court granted *the plaintiff's motion to strike this defense on the grounds that, considering the similarity of purpose and close connection between the brokerage fee statute and the usury statute, and the policies underlying Section 374 of the General Business Law (predecessor of current Section 5–521) preventing corporations from asserting a usury defense—that the corporations were not in need of such protection—Section 374 precluded application of the brokerage fee statute as a defense to plaintiff's claim. In *Srebnik v. Transportation & Travel Pavilion, Inc.,* 43 Misc.2d 860, 252 N.Y.S.2d 574 (1964), the court construed the "loan on real estate security" exception to Section 5–531 to extend to a fee claim based on procuring financing for construction of a pavilion at the World's Fair where the construction advances were to be secured by an assignment to the lender of gross rentals on subleases of the pavilion.[3]

**2.** The section prevents corporations from asserting a usury defense except for corporations whose principal asset is a one- or two-family dwelling (an exception enacted to prevent lenders from forcing would-be homeowners to incorporate so that lenders could charge usurious rates on mortgage loans), see Laws 1957, c. 968, § 1.

**3.** The Srebnik court did, however, interpret Section 5–531 as otherwise applicable to the transaction, based on a literal reading of the language in *Scudder, supra,* that the statutory bar against a corporation's interposing the usury defense does not extend to bar a corporation from asserting the brokerage fee statute as a defense, and without discussing *Middleman.* But see discussion *infra.*

In *Scudder v. Hoyt, supra*, by contrast, the court found that two individual guarantors of a corporate contract to pay brokerage fees could interpose Section 380 (the predecessor of Section 5–531) as a defense to a claim for the brokerage commission despite Section 374 (the predecessor of Section 5–521) where the loan as to which brokerage fees were claimed was procured by a broker who was also a director of the closely-held borrowing corporation; where the broker-director had failed to inform the lending corporation of his financial interest (a 3.3% commission) in the loan transaction, leading the lender to refuse to pay the broker's fee and the corporation—desperate for the funds—to promise, in a separate agreement guaranteed by the two individual defendants, to pay the broker without the knowledge of the lender after the loan was consummated; and where the corporation subsequently went bankrupt, causing the broker-director (who had obtained less than the full amount of his brokerage fee from the bankruptcy proceedings) to sue the individual guarantors. Similarly, in *Enfeld v. Diamond*, 51 N.Y.S.2d 113 (N.Y.Co. Sup.Ct. 1944), Section 380 was construed and applied to bar a plaintiff-broker's recovery in a situation in which the broker, concealing his financial interest in the lending corporation, had procured a loan of $3,000 for a closely-held corporation on harsh terms; as the court described the transaction, the plaintiff broker "pressed to advantage the distress of the defendant," *id.* at 51 N.Y.S. 114, "fully aware" that the corporate borrower would be unable to assert a defense of usury on the harsh loan.

(ii) Application

■ The Court finds that the fact pattern here is akin to that in *Middleman* and *Srebnik, supra*, rather than that in *Scudder* or *Enfeld*, and concludes that the corporate defendant here may not avoid its contractu-al obligations by asserting Section 5–531 as a defense.

The facts of this case do not suggest in the slightest the evils warned of in *Scudder* of "excessive charges for brokerage," or "extortion and unconscionable charges" imposed on desperate borrowers unable to obtain financing elsewhere. Here, Rangaire—the borrower contracting with Armstrong for brokerage services—is a prosperous corporation able to secure several sources of funding in the financial marketplace, see, *e. g.*, speech of J. M. Hill, Armstrong Affidavit, Exhibit 10 (noting, *e. g.*, that Rangaire went public in 1969). Rangaire described itself as well-satisfied with its loan arrangement with Teachers, see Armstrong Affidavit, Exhibit 7 (letter from Rangaire's president to Armstrong, Jr.) and the brokerage fees that Rangaire agreed to pay are in line with standard fees for arranging private placements of this size, see Armstrong Affidavit, Exhibit 16. Rangaire nowhere asserts that it was fraudulently induced, or coerced by extreme need or desperation, into making these arrangements, and such an assertion would not appear plausible on this record. Moreover, unlike the situation in *Scudder, supra*, and *Enfeld, supra*, Armstrong was not related in any way to either the borrowing or the lending company here, and made full disclosure of its financial interest in the loan arrangements prior to execution of Rangaire's authorization for Armstrong to solicit the initial loan. Thus, the purpose of Section 5–531 outlined in the case law—protection of vulnerable borrowers from unconscionable or extortionate charges—does not appear to be implicated here.[4]

(b) Real Estate Security Exemption

■ Even if Section 5–531 is construed as applicable to private placements with insti-

---

4. The Court further notes that in the typical case involving large-scale corporate dealings, Section 5–531 and its underlying rationale are not referred to, see, *e. g., Simon v. Electrospace Corporation*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971) (broker's fee claim in connection with corporate merger); and that the loan agreements and notes show that, insofar as the parties to the underlying transaction contemplated that the loans might fall under government regulation, they assumed that such regulation would be that of the federal securities laws rather than that of statutes such as the state usury and brokerage fee statutes.

tutional investors, the Court concludes that the statute is not applicable here under the provision exempting from the section's provisions loans on real estate security. As noted above, New York courts have construed this exception broadly, see *Srebnik, supra.* Here, the loans in question were made at least in part on the strength of defendant's holdings in real property, including its substantial limestone operations, and on the strength of defendant's expected earnings based on its manufacturing operations' physical plant and equipment and building construction contracts, and were secured, in the broad sense of providing assurance to the lender, by defendant's covenant not to otherwise encumber those properties—a provision on which both lender Teachers and borrower Rangaire placed great stress, see Armstrong Affidavit, Exhibits 3, 5 and 10—made effective by those provisions in the various notes making breach of that covenant an event of default leading to acceleration of the loan obligations on demand. This is sufficiently analogous to the financing pattern described in *Srebnik* to come within the holding of that case.[5]

*Summary*

Since it appears that no material issues of fact are in dispute, that defendant concedes its obligations under the terms of the 1967 contract, and that defendant's affirmative defense based on New York General Obligations Law § 5–531 is without legal merit, plaintiffs' motion for summary judgment is granted.

Plaintiffs shall submit a proposed judgment on ten days' notice within ten days of the date of this Opinion and Order.

SO ORDERED.

---

**5.** Since the Court has determined that Section 5–531 does not apply to this transaction, the Court need not reach the statute of limitations issues raised by the parties.