### ALTMAN v. CURTISS-WRIGHT CORPORATION.

#### No. 50.

Circuit Court of Appeals, Second Circuit.

Dec. 8, 1941.

J. Charles Weschler, of New York City, for appellant.

Kenneth M. Spence, of New York City, for appellee.

Before L. HAND, AUGUSTUS N HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment summarily dismissing his complaint upon affidavits and before answer under Rule 56(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The complaint was in two counts; the first, to recover the reasonable value of services rendered by the plaintiff to the defendant in performance of a written contract; the second, to recover for the same services on a quantum meruit. The motion was made upon two grounds: that the plaintiff had never performed the services specified in the contract; and that he had released all claims against the defendant. The district judge held that the release was final and did not consider whether the plaintiff had performed. We think that the defendant was right on both grounds, and both are open to support the judgment. Langnes v. Green, 282 U.S. 531, 535-537, 51 S.Ct. 243, 75 L.Ed. 520; LeTulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 84 L.Ed. 355.

On April 12, 1937, Altman, the plaintiff, was proposing to go to England, where he believed that he could drum up business for the defendant. He had talked with the defendant's officers, and its vice-president, Allard, sent him a letter of which the following is the substance. The company having made many tentative efforts to get business in England, "any business that may flow from those with whom the company is already in contact could not be recognized * * * as due to your efforts." Nevertheless, if in England the plaintiff could "interest those with whom the company is not in contact * * * the company * * * would recognize your assistance on the following conditions: Any proposal must be promptly communicated to the company with the names of the parties and all pertinent data. * * * If the company regards the proposal favorably, it will, in the first instance, take up with you the question of what payments, if any, are to be made to you for your services in the event that a satisfactory agreement is later effected * * * Thereafter, the company will send a representative to England who will be qualified to carry on negotiations." Commissions were to be dependent upon the defendant's entering into an agreement and "the terms of this letter" were "in any event to expire six months from date." On the 23rd the plaintiff replied that he understood all this to mean that he was to be paid for his services "regardless of whether or not sources are 'otherwise known' to you or with whom you may have been in contact." On the 26th the defendant replied sharply

that the plaintiff's letter was "entirely at variance" with its own—as it patently was —and on the next day the plaintiff "cancelled" his suggestion and agreed to the terms of the original proposal.

Soon thereafter the plaintiff went to England and busied himself with seeing promising prospects, among whom were Lord Swinton, then air minister, and Mr. Duff-Cooper, war secretary, but from neither of whom does he profess to have "communicated" to the defendant any "proposal." The measure of his performance was that on June 1st he cabled about a "most delightful conference with Lord Swinton" and on the next day he wrote, asking whether he should "arrange conference with Lord Swinton." Allard had cabled on that day that he would be in England during the first week of July and would see the plaintiff if he were still there. Allard did reach London on July 7th; but meanwhile the plaintiff had left for Paris, where Allard wrote him on the 14th to refuse his offer of a conference with Lord Swinton who was "already well known to us". Allard saw him once in Paris and once in Berlin, but at no time did the plaintiff "communicate" anything remotely resembling a "proposal," English, French or German, though he was profuse in such statements, as an "excellent foundation for mutual benefit," "started the ball rolling," "such headway that business can be done," "having created interest which may lead to business," "made most excellent connections" etc. etc. He returned to New York sometime before the 15th of December, two months after his contract expired, and on that day wrote asking that "the time element * * * be extended over a fair period." This Allard refused on the 20th in a letter to which the plaintiff answered that he was in negotiations which "it would not be consistent * * * to discontinue." Allard replied on January 4, 1938, that he wished "to make it entirely clear that whatever activities you are engaged in and whatever expenses you have incurred are for your own account."

Thus matters rested without further communications of any consequence between the parties until the plaintiff, on May 26, 1938, wrote a letter to the defendant's president, Vaughan, preparing somewhat covertly for a claim. Apparently they did not meet until late October of that year, and each gives a different version of what was said. The plaintiff's is that he made no "legal" claim at all, knowing—as was the fact—that the defendant had secured no English contracts; all he asked was some recognition of his "moral" claim for the reimbursement of his expenses in France and Germany which he put at $7,500, but for which he agreed to take $5,000. Vaughan says that he asked for $200,000 for seeing people in the three countries and for his expenses; and that it was agreed that "the release was to be an end to any claim on the part of Altman forever." Whatever was said, it is clear that Vaughan put Election Day, November 8th, as a time limit upon his offer and that he cancelled it on the 9th, after receiving a telegram from the plaintiff that he had been unable to see his attorneys "concerning your offer for settlement." Negotiations were however resumed later and the plaintiff signed a release on the 16th and accepted $5,000, also giving a receipt that it was "in settlement of all claims." The release was general and in the usual form; it covered among other things all "causes of actions, suits, debts, dues, sums of money * * * claims and demands whatsoever in law or in equity * * * which * * * I * * * now have, or which my heirs, executors or administrators, hereafter, can, shall or may have * * * to the day * * * of these presents."

From the foregoing it appears that the plaintiff never fulfilled the condition which the defendant had imposed upon its promise. The letter is clear; he was to "communicate" the proposal of some named party with enough details for the defendant to "reach a decision" whether it wished to consider it; also that the proposal should come from some one "with whom the company is not in contact." If the defendant regarded the proposal favorably, it would discuss with the plaintiff what he should get if any contract was made, and then it would send a representative abroad to make the contract. The plaintiff thus took the chance in all he did that he could procure some definite proposal to communicate; and he secured nothing of the kind, either within six months or later. We need not consider whether he could have succeeded, if the defendant had interfered with preparatory negotiations, had prevented his "communicating a proposal," and had then made a contract without him. His complaint does not so read, and cannot be so read. He intimates—it is no more—that Allard took over the benefit of what he did

when he went to London in July, but it would make no difference if that were true; nothing would serve but a proposal, and he does not suggest that he was prevented from procuring a proposal. As for the quantum meruit, express contract forbade it.

Furthermore, we think that the release was a good discharge, even if the plaintiff had had a valid claim. He was fully advised, and if he did not consult his lawyers, as he said he wished to do, he at least took time to do so. He cannot profess—we are not sure that he does profess—that he was defrauded. Vaughan told him nothing that was not true, and suppressed nothing from him. The supposed basis for disaffirmance is that the plaintiff was pressing only "moral" claims for his expenses in France and Germany, and did not have any English claim "in mind," as he could not have had, for there was none. Whether he did or not is entirely immaterial because the words he used could necessarily have meant only legal claims. It is impossible to "release" a "moral" claim; and the release of all claims "in law or in equity" obviously showed that the defendant was insisting on the release of legal claims. The only legal claims that could possibly exist were English claims; and if the parties were aware of none then existing it was immaterial. Kirchner v. New Home Sewing Machine Company, 135 N.Y. 182, 31 N.E. 1104. Nor should the release be reformed, as the plaintiff faintly suggests. It was written precisely as the parties meant it to read; it cannot be reformed so as to express their intent better than it did.

The plaintiff finally attempts to be rid of the release on the theory that without special mention it could not discharge a contingent or future claim; and that any English claim was contingent. Farnham v. Farnham, 204 App.Div. 573, 198 N.Y.S. 771; Dworkin v. Dworkin, 247 App.Div. 213, 286 N.Y.S. 982; Celmer v. Feinborough Homes, Inc., 253 App.Div. 832, 1 N.Y.S.2d 598. That doctrine is confessedly only a canon of construction; a release in general terms will serve if the intent be plain from recitals for example. Gurnee v. Hasbrouck, 267 N.Y. 57, 195 N.E. 683. The intent here was plain for the reasons we have just mentioned; i. e. there was nothing but the English claim for it to discharge, and it would be absurd to use a mere canon of construction to deprive the very instrument construed of all legal effect. The argument is of a piece with the whole action, which has no merit, legally, morally or otherwise. There was no issue to try, and the remedy of summary judgment is designed to bar exactly such opportunities for unjust exactions to escape the delay and expense of a trial.

Judgment affirmed.