EPAMINONDAS K. PAPAIOANNOU et al., Appellants, *v.* STEPHAN P. BRITZ, Respondent.

First Department, April 13, 1955.

*Leonard Hemley* of counsel (*Morris L. Wolf* with him on the brief; *House, Grossman, Vorhaus & Hemley,* attorneys), for appellants.

*Jerome I. Hyman* of counsel (*Louis Gischner* with him on the brief; *Louis Gischner,* attorney), for respondent.

BREITEL, J. Plaintiffs' complaint was dismissed by the court at the close of their proof, upon a jury trial, on the ground that the written memoranda received in evidence did not satisfy the Statute of Frauds. They appeal.

The action was brought on an alleged oral antenuptial agreement between the prospective bridegroom and the wife's brother, natives of Greece, but residents of New York City. The brother is alleged to have repeated at least some of the promises to his sister, the prospective bride. The marriage took place, and the married couple now sue their brother-in-law and brother, respectively, for breach of his alleged oral promises to provide the married couple in gross $175,000.

The bride, who had never been married, was approaching forty years of age. The bridegroom was about fifty, trained as a physician in Europe, but waiting to be licensed in this State. Before the couple met, the defendant brother met the prospective bridegroom through an intermediary, a mutual friend and editor of a Greek language newspaper. The defendant brother is supposed to have said: " Doctor, I arranged everything to

meet my sister, and if you marry my sister I will give you $100,000, medical establishment, home * * * For your office, your home, the medical instruments, I will give you $75,000." This was in the summer of 1948. Thereafter the couple-to-be met, had a number of dinners together, and soon the acquaintanceship ripened into an engagement to marry. On the night of November 4th of the same year, the defendant brother is again supposed to have said to his sister's affianced: " Doctor, last night I saw my sister. She told everything about my promises, and it isn't necessary to worry because I arranged everything. It isn't necessary to worry, doctor. I tell you I will give you $100,000, and I will give you $75,000 for your medical establishment, so it isn't necessary to worry."

There were further confirmatory conversations, it was testified, on the day of the civil marriage ceremony, and again, before the church marriage ceremony. In each, the promises were repeated, and the sums of money, and their purposes, were again repeated.

The alleged promises were never kept. Two years passed, and each time that the defendant brother was pressed to perform his word, the now-married couple were put off with excuses based on business or family necessities.

In 1950, the defendant brother was in Greece and there was an exchange of correspondence between him and plaintiffs, his sister and his brother-in-law. The letters are replete with information and concern about conditions generally in Greece, the condition specifically of the family in Greece, and about the business and financial contretemps of the brother. There are many touching and affectionate exchanges of personal concern and interest.

Mingled in this correspondence, however, are detailed references to the defendant brother's antenuptial oral promises, set forth by the brother-in-law in his letters. In his responses to these letters, the defendant brother repeatedly, but in the most general terms, assures his brother-in-law and his sister that the promises will be kept. He asks only for the trust and confidence to which he is entitled, as one who has always faithfully, over the many years, tended the needs of every member of his family.

The question is whether these letters satisfy the Statute of Frauds pertaining to antenuptial agreements (Personal Property Law, § 31, subd. 3). The statute reads: " Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agree-

ment, promise or undertaking: * * * 3. Is made in consideration of marriage, except mutual promises to marry".

In the brother-in-law's letters, it is said, among many other things, with reference to the promises, and allegedly quoting the defendant brother, as follows: "I will build him a house, buy him equipment, give him $100,000 ($50,000 cash and $50,000 in bonds) and later on help him with his clinic." And again it is written: "You well remember that you once told me to have patience for just one month, after which you would settle for $100,000, a house, instruments and a medical office, all of which would total $175,000." And once again: "Nobody forced you to make these promises. You made them yourself one year before the wedding when you spoke to Mr. Constantinedes, whom you were pushing to arrange matters to lead to a wedding. All these things were done against my will. I wanted to work in order to purchase equipment and I didn't want to get married before I opened an office."

In responses, identified as such by dates, the defendant brother, in letters subscribed by him, said: "unfortunately, I was not in a position to keep my promise about your money * * * Health only, I will give you money. * * * I never ceased thinking about what I have to do concerning my promises in order to see my little sister Helen in total Happiness, because your happiness is our own as well." And again: "I do not want you ever to believe that I don't share your thoughts about my promises, and your efforts try to make your dreams come true."

There is more in the letters but this should suffice.

The issue is whether plaintiffs made out a prima facie case of an oral promise on a consideration of marriage, and whether there is a sufficient memorandum in writing to satisfy the Statute of Frauds. It would have been for the jury to determine whether the testimony as to the oral promises was to be believed. It also would have been for the jury to find whether, from the context of the letters, there was, as a matter of intention, an adoption of the statements made in the plaintiff brother-in-law's letters to defendant, denoting, as they do, promises made in advance of the marriage and in consideration therefor.

The writing, in order to have a memorandum to satisfy the Statute of Frauds, need not be contained in any one paper, but may include unsigned writings by the promisor or his agent, united by content or reference, and even, in a proper framework, united by parol evidence. (*Crabtree* v. *Elizabeth Arden Sales Corp.*, 305 N. Y. 48, 54, *et seq.*) Moreover, the several writings

may arise from an exchange of correspondence, only part of which is signed by the promisor, where the signed portion connects or unites the unsigned portion by internal identification or reference. (*Peck* v. *Vandemark,* 99 N. Y. 29; *Delaware Mills* v. *Carpenter Bros.,* 200 App. Div. 324, affd. 235 N. Y. 537; 2 Williston on Contracts [rev. ed.], § 581; 2 Corbin on Contracts, § 516; Restatement, Contracts, § 208, especially illustration 7.) Indeed, the *Peck* case is most relevant. It involved an antenuptial agreement evidenced by an exchange of correspondence. There, the correspondence antedated the marriage. But that is immaterial. A memorandum to satisfy the Statute of Frauds may come into existence after the making of the contract (*Spiegel* v. *Lowenstein,* 162 App. Div. 443; 2 Corbin on Contracts, § 503, pp. 714–715; Restatement, Contracts, § 214.)

On their face, the writings in this case satisfy the statute. The plaintiff brother-in-law's letters recite the inducement to marry — the consideration — and the specific terms of the promises. As to consideration, it has been said that it need not be expressed in any particular terms; it is sufficient if it appears " by fair or necessary inference ". (*Seymour* v. *Warren,* 179 N. Y. 1, 3 *et seq.*) Moreover, it is not clear that the memorandum need set forth the consideration. (*Standard Oil Co. of N. Y.* v. *Koch,* 260 N. Y. 150; 2 Williston on Contracts [rev. ed.], §§ 570–573; 2 Corbin on Contracts, § 501, pp. 700–701.) While time of performance was not specified, that, in these circumstances, is not essential. The law supplies the terms of a reasonable time in which to perform (2 Williston on Contracts [rev. ed.], § 575, pp. 1646–1647; Restatement, Contracts, § 207, illustration 12.) The references to promises in the defendant brother's letters are prima facie admissions of the specific promises recited in the brother-in-law's letters. There are no other promises referred to in the letters in question. True, the letter writer may offer to explain away these seeming admissions or adoptions, and a jury would be privileged to accept such explanations as true. It is obvious that these were letters between demonstrative relatives, with respect to a family matter, and a jury might well question whether every assertion of alleged fact required from the correspondent a specific denial or qualification. This was not commercial correspondence. Had this been commercial correspondence, it would have been clearer that there was an adoption by admission and omission to deny or qualify. On the other hand, on its face, the correspondence spells out a series of promises and, in form, an adoption of those promises in letters signed by the defendant brother.

Plaintiffs had made out a prima facie case, and, consequently, the complaint could not be dismissed. In the context of parties making their plans and arrangements in a continental pattern, which once perhaps prevailed in this country (cf. *Peck* v. *Vandemark,* 99 N. Y. 29, *supra*), but may not now satisfy the romantic standards of many, the jury will have to determine whether the oral agreement was made out. So too, the jury will have to determine whether the letters were a sincere exchange or a foreplanned device to meet legal requirements. If the latter, a jury might find that a loving brother accepted responsibility for more than he had promised, or inadvertently and inaccurately conceded the time, manner and circumstances in which the promises were made, because he did not wish to offend.

The judgment dismissing the complaint should be reversed, and a new trial granted.

PECK, P. J., COHN, BASTOW and RABIN, JJ., concur.

Judgment unanimously reversed and a new trial ordered, with costs to the appellants to abide the event.