Georgia O'KEEFFE, Plaintiff,

v.

Doris BRY, Defendant.

No. 77 Civ. 2576.

United States District Court,
S. D. New York.

Aug. 8, 1978.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff; Sheldon Oliensis, Steven J. Glassman, Geri S. Krauss, New York City, of counsel.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for defendant; Maurice N. Nessen, Gregory G. Jones, Alan R. Friedman, New York City, of counsel.

LASKER, District Judge.

For many years during her remarkable and long artistic career, Georgia O'Keeffe employed the services of a commissioned sales agent, Doris Bry.[1] Bry was authorized to sell not only O'Keeffe's works of art, which include paintings, watercolors, drawings and pastels, but also the photographic works of Alfred Stieglitz, O'Keeffe's late husband.

After an apparent falling out between the artist and her agent, O'Keeffe terminated the agency (see Exhibit F, Downey Affidavit) and demanded the return of all her works of art, as well as the works of Stieglitz. When Bry refused to honor O'Keeffe's demand, this action was commenced, in May, 1977. O'Keeffe prays for the return of all of her and Stieglitz's works and seeks an accounting by Bry for moneys due on the sale of those works.

Shortly after the filing of the complaint, O'Keeffe moved for a preliminary injunction, requiring that all the relevant artworks (as well as certain ancillary items belonging to her) in Bry's custody be transferred to a safe place. Upon finding, *inter alia,* that "Miss O'Keeffe is the owner of the properties for which she seeks replevin or recovery," (Transcript of proceedings of June 10, 1977 at 33), the motion was granted. No order was entered because counsel for Bry represented that his client would comply voluntarily.

After preliminary relief had been granted, Bry then filed an answer, later superseded by an amended answer, which asserted five counterclaims, for breach of contract and for recovery in *quantum meruit.* O'Keeffe moved to dismiss the counterclaims on the grounds that: (1) the contract claims were barred by the statute of frauds and (2) the *quantum meruit* claim was precluded by the existence of an express contract covering the services for which equitable restitution was sought. In opposition, Bry argued that with regard to the contract claims, discovery might yield documents satisfying the statute of frauds require-

---

1. Exhibit A to Affidavit of Maurice Nessen, July 19, 1977; Exhibit A to Affidavit of James Downey, annexed to the motion for preliminary injunction, May 13, 1977.

ment. As for the allegedly preemptive express contract, Bry contended that examination of the contract alone gave no indication whether the services underlying the *quantum meruit* claim were within the ambit of the express agreement. It was claimed that resolution of the *quantum meruit* claim involved a question of interpretation, a matter of fact that could not be decided on the motion to dismiss. On August 12, 1977, the motion to dismiss the counterclaims was denied, without prejudice to renewal after completion of the following discovery: (1) the taking of depositions of Bry and Downey (O'Keeffe's personal attorney), and (2) the delivery to the court for *in camera* inspection of O'Keeffe's wills and trusts (which documents Bry believed would contain the written terms of the oral agreements asserted in her counterclaims).

Now, after completion of that discovery, as well as production of the wills and trusts for inspection by Bry's counsel, O'Keeffe renews her motion to dismiss the counterclaims pursuant to 12(b)(6), Federal Rules of Civil Procedure, or, in the alternative, to dispose of them by summary judgment. Because Bry has failed to raise a genuine issue of fact that there is any writing sufficient to satisfy the statute of frauds, judgment is granted in O'Keeffe's favor with respect to the first three counterclaims. As for the fourth counterclaim, in *quantum meruit,* although it presently appears that it may be barred by the express contract governing the O'Keeffe/Bry business relationship, the question whether services for which Bry seeks additional compensation are covered by the contract raises a genuine issue of material fact that cannot be resolved on the present state of the record.[2]

### I.

Before analyzing the impact of the statute of frauds on the counterclaims, two preliminary issues, of discovery and choice of law, must be resolved.

### (A)

First, Bry's counsel contends that until O'Keeffe is deposed, it will be impossible to know whether there exists some document sufficient to satisfy the writing requirement. Against the history of this case, this contention appears to be disingenuous.

At the outset of this litigation, Bry submitted a sworn statement (Bry Affidavit, June 6, 1977) in which she unequivocally identified the documents said to contain the alleged oral agreements: these were the "Harvard Agreement" and O'Keeffe's wills and trusts (*id.,* at ¶¶ 12, 13, 16, quoted *infra* at 828; and ¶ 27). Upon our view that production of these extremely personal documents would constitute a possibly unwarranted invasion of O'Keeffe's privacy, we declined to order their immediate transmittal to Bry. Instead, they were submitted for *in camera* inspection. Review quickly revealed that the documents did not contain the claimed agreements, and this was communicated to Bry's counsel.

All agreed that the documentation issue ought to be expeditiously resolved, and to this end, Bry's deposition testimony was crucial. However, months passed without any word from Bry's corner how, in light of the court's negative findings with regard to the wills and trusts, Bry expected to establish her contractual counterclaims. (Apparently, substantial delays were experienced in the attempt to depose Bry.) In March, 1978, a conference was called and the court requested that Bry demonstrate how she planned to eliminate the apparent bar of the statute of frauds. At the court's request, and on the basis of Bry's deposition testimony, her counsel submitted a letter with a "list of documents upon which we

**2.** The fifth counterclaim is for (1) an order placing all O'Keeffe paintings that have been in Bry's possession into court custody and (2) specific performance of the promises alleged in the first three counterclaims. The first branch of the counterclaim was mooted by the court's ruling of June 10, 1977 (see *supra,* at 824). The request for specific relief must be denied pursuant to the conclusion that enforcement of the alleged promises is barred by the statute of frauds (see *infra,* at 828–830).

rely to fulfill the Statute's requirements."[3] The list mentions: (1) seventeen documents that were marked at the depositions of Bry and Downey, (2) drafts—including the final one—of the Harvard Agreement, (3) O'Keeffe's wills and trusts, and (4) ten letters from the correspondence between Downey and O'Keeffe, as to which O'Keeffe asserted the attorney client privilege.[4] (The deposition documents and the drafts of the Harvard Agreement, all of which papers Bry's counsel had seen at the time the letter was written, were merely listed. No explanation was offered how they satisfied the statute of frauds.) The newly denominated items were submitted for inspection by the court. Again, it was plain that none of them contained a contractual commitment by Bry to O'Keeffe.

Nevertheless, disposition of the contractual counterclaims was deferred. A pre-trial conference was held in May, 1978, and at the urging of Bry's counsel, the court agreed to make the wills and trusts available under a protective order. Bry's counsel was instructed to complete their inspection of the documents and to identify those portions of the wills, trusts, and any other writings that, in their view, established compliance with the statute of frauds.

■ In response to this straightforward request, Bry's counsel two months later submitted a lengthy affidavit.[5] Most of it is unresponsive, but to the extent that the affidavit does not analyze the wills and trusts, it confirms the court's earlier conclusion that those documents do not embody a contractual commitment. Bry's counsel now urges inspection of 82 further documents, which have been withheld under a claim of attorney client privilege,[6] and he repeats the need to depose O'Keeffe. As for the requested deposition, no offer of proof is made. Indeed, we can conceive of no purpose that such deposition would serve, except to ask O'Keeffe if she ever executed a writing containing any of the

---

**3.** See Bry's counsel's letter of March 10, 1978. The letter indicated that in addition to the listed documents, deposition of O'Keeffe might lead to relevant writings, although there was no suggestion of Bry's inability to identify the documents on which she relied. To the contrary: for her part, Bry, testifying on deposition, clearly identified the writings on which her contract claims are based. As she had done previously (by her June, 1977 affidavit) she mentioned the Harvard Agreement and the wills, as well as incidental items of correspondence that were marked at her and Downey's deposition (Transcript of Bry Deposition at 442–52, 572).

**4.** The O'Keeffe-Downey letters have been submitted to the court for the purpose of determining the propriety of the claim of privilege. Having reviewed the letters *in camera*, we find that all of them either give or seek legal advice and, as such, are clearly privileged communications between attorney and client. *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 47 F.R.D. 334, 339 (S.D.N.Y.1969); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950). Letters by Downey—eight of the ten that are mentioned—do not qualify. At the very least, the statute of frauds requires a writing signed by the party to be charged. *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 55, 110 N.E.2d 551 (1953).

**5.** Nessen Affidavit of July 14, 1978.

**6.** None of the documents mentioned in the current affidavit was mentioned in the March 10th letter from Bry's counsel, which was supposed to contain a list of all the documents upon which Bry was relying. Although the request is untimely, we have considered it, and find that none of the documents advances Bry's position.

Of the 82 documents, only eight are signed by O'Keeffe, and therefore, are the only ones that could conceivably satisfy the statute of frauds.

Moreover, upon our *in camera* inspection of all the requested documents—letters and memoranda—we find that all but six of them are clearly privileged and that the six others may perhaps be privileged. The letters either seek or give legal advice. The memoranda either record confidential communications between attorney and client or else fall within the classic definition of attorney work product.

The six letters as to which there is a question of privilege are from O'Keeffe's attorney to a trustee of O'Keeffe's estate. Counsel for O'Keeffe has been instructed by the Court to make them available to counsel for Bry (without prejudice to O'Keeffe's claim of privilege). Having received Bry's counsel's arguments with respect to these letters, we find that the letters are irrelevant to Bry's contract claims: they are not signed by O'Keeffe, and in any event, they contain no promises.

promises alleged by Bry. This question could long since have been resolved by written interrogatory.

In sum, Bry's position on the identity of the alleged writings has evolved from one of specificity to one of undefined generality.

### (B)

Bry suggests that enforceability of the alleged contracts is controlled by New Mexico law, whose statute of frauds is said to present "no possible bar to the contracts pleaded" (Bry Memorandum of July 20, 1977, at 20). New Mexico law might permit the enforcement of some of the contracts alleged by Bry, notwithstanding the absence of a writing.[7]

Because this is a diversity action, New York's choice of law rules govern, *Klaxon v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and under those rules, "controlling effect [is given] to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). The "specific issue" involved here might be characterized as the applicability of the statute of frauds to a contract, or contracts, involving promises by O'Keeffe to establish a trust and to make various testamentary provisions and a promise by Bry to render a performance that cannot be completed before a lifetime. Under this characterization, New York State's interest would be determined by analyzing the purposes of § 5–701(a)(1) of the General Obligations Law ("G.O.L.") (McKinney's 1978) and § 13–2.1 of the Estates, Powers &

Trusts Law ("E.P.T.L.") (McKinney's 1967), which specifically require written memoranda of contracts containing such categories of promise. *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968) (". . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.") However, a compartmentalized analysis would be artificial in this case. The various promises alleged to have been made by O'Keeffe constituted the consideration in an overarching agency agreement, one that was allegedly to last a lifetime, so that in deciding whether the specific provisions of New York law apply, we are guided not by the policies underlying the individual statutes, but by more general considerations having to do with New York's interest in policing agents. Put another way, the decision whether New York law applies depends on the nature of the alleged contract viewed as a whole.

New York's interest in the enforcement issue involved here was plainly described in *Intercontinental Planning Limited v. Daystrom, Incorporated*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). There, a New York agent sought recovery from a foreign principal on an oral contract for finder's fees in connection with having arranged the purchase of a business. Although the New York Court of Appeals was construing a different provision of the statute of frauds, § 5–701(a)(10) of the G.O.L. (covering contracts for broker's fees), its remarks apply to the present case, and its observations about the role of New York State in the business world equally describe the State's role in the art world:

"It is common knowledge that New York is a national and international center for

---

7. New Mexico has no codified version of the statute of frauds. It has, by court ruling, adopted the English version of the statute, 29 Charles II, c. 3. *Childers v. Talbott*, 4 N.M. 336, 16 P. 275, 276 (1888); *accord, Skarda v. Skarda*, 87 N.M. 497, 536 P.2d 257, 269 (1975); *Jennings v. Ruidoso Racing Association*, 79 N.M. 144, 441 P.2d 42, 44 (1968); *Pitek v. McGuire*, 51 N.M. 364, 184 P.2d 647, 651 (1947). Though the English Statute of Frauds might bar the promise to create a $50,000. per

annum trust, 72 Am.Jr.2d § 77 at 630 ("An agreement to bequeath personalty is in the nature of a contract for its sale and is under the provision of the statute of frauds relating to contracts for the sale of personalty when the value exceeds the statutory amount."), it would not preclude the promise of a lifetime and continuing agency or the promise to make Bry the executor of the O'Keeffe estate. See 72 Am. Jur.2d §§ 28, 42.

the purchase and sale of businesses . . We conclude therefore . . . [that enactment of § 5–701(a)(10) was] intended to protect not only . . . [New York] residents, but also those who come into New York and take advantage of our position as an international clearing house and market place. This is true because of all the jurisdictions involved, New York Law affords the foreign principals the greatest degree of protection against the unfounded claims of brokers and finders. This encourages the use of New York brokers and finders by foreign principals and contributes to the economic development of our State." *Intercontinental Planning Limited v. Daystrom, Incorporated, supra,* 24 N.Y.2d at 383–4, 300 N.Y.S.2d at 826–7, 248 N.E.2d at 582. In light of the facts of this case, the policies described in *Daystrom* would be furthered by application of the relevant provisions of New York's statute of frauds. O'Keeffe is a resident of New Mexico. She has employed the services of a New York agent, Bry, and has entrusted her with numerous, valuable works of art. Having brought her art and her business here, she is entitled to the protection which New York provides in such circumstances. Moreover, since Bry is a New Yorker and since a substantial part, if not all, of her agency work was conducted in New York, application of New York law cannot be said to disappoint her reasonable expectations.

Against New York's substantial interest, Bry has suggested no stake that New Mexico might have in applying its statute of frauds (thereby affording less protection to one of its residents than New York State offers). We conclude, therefore, that New York law applies.[8]

## II.

*First Counterclaim*

In her first counterclaim, Bry alleges that:

8. Statutes of frauds also serve the general purpose of protecting the integrity of the judicial process in the courts of the enacting state. *Daystrom,* 24 N.Y.2d at 385, 300 N.Y.S.2d at

". . . Miss O'Keeffe contracted with Miss Bry to make her the exclusive agent and market-maker for Miss O'Keeffe's artwork during Miss O'Keeffe's lifetime in consideration for Miss Bry agreeing to act as exclusive agent to market her artworks and to perform curatorial and public relations work for Miss O'Keeffe and her artwork . . ." (¶ 21, Amended Answer).

A more detailed description of this claim is provided in Bry's affidavit of June 7, 1977, submitted in opposition to the motion for a preliminary injunction. There, Bry asserts that

"In 1972, Miss O'Keeffe and I, with our joint lawyer, James F. Downey, began discussions with representatives of Harvard University about Miss O'Keeffe leaving a gift of her works to the University. At this time, Miss O'Keeffe, at my insistence, abandoned the notion that she could discharge me at will: she told me that I was her 'exclusive agent' and said that the agency would continue for her life . . . [She also gave other assurances] . . . At her request, the Harvard University agreement was to be worded to reflect and ensure all of that.

"The Harvard Agreement was signed in October, 1972. . . . I was told by Mr. Downey . . . that it . . . reflected necessarily the commitment that I would be the exclusive agent for Miss O'Keeffe during her life.

\* \* \* \* \* \*

"Thus, by 1973, with the commitments made by Miss O'Keeffe—embodied, I believed, in her will and in the provisions of the Harvard Agreement—I thought that I had finally achieved the security I needed . . ." (¶¶ 12, 13, 16, Bry Affidavit).

Applying New York's statute of frauds to the first counterclaim, the rele-

828, 248 N.E.2d at 583. In this regard, only the forum state, New York, has an interest in applying its statutes.

vant provision of New York law is § 5–701(a)(1) of the G.O.L., which requires a writing in cases of an agreement which, like this one, cannot be fully performed before the conclusion of a (O'Keeffe's) lifetime. *Meltzer v. Koenigsberg,* 302 N.Y. 523, 99 N.E.2d 679 (1951); *Bayreuther v. Reinisch,* 264 App.Div. 138, 34 N.Y.S.2d 674 (1st Dept. 1942), *aff'd,* 290 N.Y. 553, 47 N.E.2d 959 (1943).

Bry argues that § 5–701(a)(1) is satisfied by the Harvard Agreement and the wills and trusts, that these documents, either in and of themselves or in conjunction with "contemporaneous memoranda and all the surrounding circumstances, clearly evidence . . . the existence of a contractual relationship between Miss Bry and Miss O'Keeffe." (Bry Memorandum of May 9, 1978 at 14; see also, Bry's counsel's letter of March 10, 1978). Specifically, Bry relies on paragraph "Sixth" of the Harvard Agreement, which provides that:

> "Doris Bry has been associated with O'Keeffe for over twenty-five . . . years, and has been the exclusive agent for the sale of her paintings for more than seven . . . years, . . . and O'Keeffe anticipates and is arranging her affairs in such a way that Doris Bry will supervise the disposition of all or most of the paintings owned by O'Keeffe at the time of her death. To the extent that the pictures are not disposed of by Doris Bry, and Harvard is charged with the responsibility of disposing of them . . . O'Keeffe expresses the wish but does not direct that Harvard will employ such agent for the sale of the paintings and give heed to such other requests and advice as Doris Bry may have specified from time to time during her lifetime."

However, this passage is not concerned with the matter of a lifetime agency (to continue throughout O'Keeffe's life), but rather with distribution of O'Keeffe's work after her death. More to the point, the language of this clause is plainly insufficient to constitute a binding commitment, since it is expressly precatory.

In an attempt to overcome the fundamental deficiency of the quoted writing, Bry argues that "[u]nder New York Law, . . . a 'confluence of memoranda' may be used to avert the impact of the statute of frauds. Almost any kind of writing is sufficient . . . A number of writings, both signed and unsigned, may be pieced together to satisfy the statute's requirements." (Memorandum of July 20, 1977 at 16) This casual theory of the statute of frauds is said to be founded upon *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E. 551 (1953) and Bry's counsel have merely submitted a lengthy list of documents which are claimed to "connect up" so as to satisfy the writing requirement. (See Bry's counsel's letter of March 10, 1978. As indicated above, the letter offers a list without any explanation; for example: "Letter dated December 11, 1969, O'Keeffe to Bry (PX 34); Letter dated August 4, 1971, Bry to Downey (BX 38) . . .")

■ There is no need for extensive discussion of Bry's counsel's interpretation of New York law. To the extent that *Crabtree* permits the use of a "confluence of memoranda," the minimum condition for such use is the existence of one document establishing the basic, underlying contractual commitment. *Crabtree, supra,* 305 N.Y. at 55, 110 N.E.2d 551. In every case cited by Bry in support of the "connective" theory, a core document evidencing a promise was present, and additional memoranda were permitted only to supply essential terms of the agreement (provided that the additional documents referred on their face to the transaction covered by the core document), not to piece together the existence of the agreement itself. See *Bruce Realty Company of Florida v. Berger,* 327 F.Supp. 507 (S.D.N.Y.1971); *Crabtree v. Elizabeth Arden Sales Corp., supra,* 305 N.Y. 48, 110 N.E.2d 551; *Stulsaft v. Mercer Tube & Mfg. Co.,* 288 N.Y. 255, 43 N.E.2d 31 (1942); *Marks v. Cowdin,* 226 N.Y. 138, 123 N.E. 139 (1919); *Papaioannou v. Britz,* 285 App. Div. 596, 139 N.Y.S.2d 658 (1st Dept.1955). It has never been held that the fundamental assent to contractual status may be read

out of a collage of documents. *Oswald v. Allen,* 417 F.2d 43 (2d Cir. 1969). Moreover, even if the law permitted a party to "add up" documents in order to show the basic promise, the documents in this case do not, when so added, come to a promise.

The contract alleged in the first counterclaim is not evidenced by a writing signed by O'Keeffe. Therefore, its enforcement is barred by the statute of frauds, and the counterclaim is dismissed.

### Second Counterclaim

■ Bry's second counterclaim alleges that in return for the promise to act as "agent, market-maker, publicist and 'in-house' curator . . . during . . . O'Keeffe's lifetime," O'Keeffe agreed to create a trust "and did, in fact, create a trust in one or more wills" that would guarantee Bry "an income of at least $50,000 a year should she outlive Miss O'Keeffe." (¶ 25, Amended Answer)

Either as a contract that cannot be performed before the end of O'Keeffe's lifetime or as one to establish a trust, this agreement is unenforceable under New York law absent a writing meeting the requirements of G.O.L. § 5–701(a)(1); E.P.T.L. § 13–2.1(a)(1).

■ The Harvard Agreement, one of the documents on which Bry relies in her attempt to satisfy the requirement of a writing, does not contain a promise to create a trust; neither do the wills or trusts. The fact that an early version of an O'Keeffe trust agreement provided for an annuity (though not as described by Bry) does not surmount the statute of frauds problem. First, the early trust was revocable and was in fact revoked (see ¶ 23, Nessen Affidavit of July 14, 1978). Moreover, it is evident that a provision in a revocable trust cannot be invoked as proof of a binding contract to make such a provision, since otherwise the power of revocation would be utterly lost.

When a trust agreement itself is offered as proof of compliance with the statute of frauds it must contain more than a beneficial provision such as is alleged to have been agreed to orally: it must clearly recite the contract, including words of promise or agreement.[9] No such recitation appearing in the wills, the trust agreement, or in any other document, Bry's claim based on the alleged promise to create a trust fails under the statute of frauds.

### Third Counterclaim

■ The third counterclaim is based on alleged promises to make Bry the executor of O'Keeffe's estate and to empower Bry to act as a sales agent after O'Keeffe's death. In return, Bry alleges, she agreed to "perform as Miss O'Keeffe's agent, market-maker, publicist and 'in-house' curator for Miss O'Keeffe's artworks during her life and for her estate . . ." (¶ 29, Amended Answer). These promises were oral (¶ 12, Bry Affidavit) although Bry swears that she was told that the Harvard Agreement would reflect the promised sales agency and that O'Keeffe's wills would contain the commitment to make Bry the executor (*Id.,* at ¶ 13).

The alleged promises are unenforceable. Bry's falls within § 5–701(a)(1) of the G.O.L. since her performance cannot be completed before O'Keeffe's lifetime. O'Keeffe's promises are governed by E.P.T.L. § 13–2.1, as promises to make a testamentary disposition. Because the promises are not evidenced in the Harvard Agreement, the wills, the trust agreement, or in any other document, they are unenforceable, and the third counterclaim must be dismissed.

### III.

In addition to her contract claims, Bry seeks recovery in *quantum meruit* for services that she has rendered on behalf of O'Keeffe (Fourth Counterclaim):

**9.** *Pershall v. Elliot,* 249 N.Y. 183, 163 N.E. 554 (1928); *Hunt v. Hunt,* 55 App.Div. 430, 66 N.Y.S. 957 (4th Dept.1900), *aff'd,* 171 N.Y. 396, 64 N.E. 159 (1902); *In the Matter of Estate of Thoens,* 88 Misc.2d 1006, 392 N.Y.S.2d 774 (Surr.Ct.1975), *aff'd,* 41 N.Y.2d 823, 393 N.Y.S.2d 398, 361 N.E.2d 1046 (1977). The rationale of these cases, involving agreements to make testamentary dispositions, applies with equal force to agreements to create trusts.

"From 1971 to date, Miss Bry has performed services for Miss O'Keeffe as an agent, market-maker, publicist and 'in-house' curator for her artworks. She has foregone other opportunities and large sums of money to perform these services properly and has devoted virtually her full working hours in order to perform the services.

"Miss O'Keeffe was aware that Miss Bry expected to be paid compensation in excess of commissions actually earned and was prepared to compensate Miss Bry adequately for her services." (¶¶ 33, 34, Amended Answer)

O'Keeffe asserts that Bry's work for her was covered by an express contract, which fixed Bry's rate of commission at 25% of the amount received for sales of O'Keeffe's or Stieglitz' works of art:

"Dear Miss O'Keeffe:

I am writing you with reference to your letters to me of September 15 and 23, which authorize me to sell your paintings, drawings, and Stieglitz material at a commission of 25%. I confirm that this is our agreement." (Exhibit A to Downey Affidavit)

O'Keeffe is correct in her argument that *quantum meruit* recovery is unavailable when the services for which it is sought are covered by an express contract. *Miller v. Schloss,* 218 N.Y. 400, 406–7, 113 N.E. 337 (1916); *accord, Altman v. Curtiss-Wright Corporation,* 124 F.2d 177, 180 (2d Cir. 1941); *Robinson v. Munn,* 238 N.Y. 40, 43, 143 N.E. 784 (1924); *Levi v. Power Conversion, Inc.,* 47 A.D.2d 543, 363 N.Y.S.2d 103, 104 (2d Dept.1975); *Jontow v. Jontow,* 34 A.D.2d 744, 310 N.Y.S.2d 145 (1st Dept. 1970); *Abinet v. Mediavilla,* 5 A.D.2d 679, 169 N.Y.S.2d 231, 232 (2d Dept.1957); *Moore v. Mason & Hanger Co.,* 35 N.Y.S.2d 687 (Sup.Ct.N.Y.Co.1942). Were the rule otherwise, written compensation terms would be meaningless.

10. It should be emphasized that if Bry prevails on her *quantum meruit* counterclaim, she will not be entitled to recover anything more than the fair value of her "additional services." In particular, she cannot use the device of *quantum meruit* to enforce the alleged promises—barred by the statute of frauds—for a lifetime

However, the coverage of the express contract here involves issues of fact, which cannot be resolved as the record stands. In particular, when *quantum meruit* recovery is sought by a salaried employee for "services rendered which fall outside the scope of duties of [the expressly agreed to] employment," entitlement to recovery turns on the question whether the "additional services" are "so distinct from the duties of [the] employment that it would be unreasonable for the employer to assume that they were rendered without expectation of further pay." *Robinson v. Munn, supra,* 238 N.Y. at 43, 143 N.E. 784, 785. The question of reasonable expectations is one of fact which remains for determination.[10]

In sum, plaintiff's motion for summary judgment is granted with respect to counterclaims "First," "Second," "Third," and "Fifth." The motion is denied with respect to counterclaim "Fourth."

It is so ordered.

and continuing agency, a trust income, and executorship. *Dung v. Parker,* 52 N.Y. 494 (1873); *Hausen v. Academy Printing & Specialty Co.,* 34 A.D.2d 792, 311 N.Y.S.2d 613, 614 (2d Dept.1970); *Potter v. Emerol Mfg. Co.,* 275 A.D. 265, 89 N.Y.S.2d 68, 71 (1st Dept.1949).